**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re:                                                                                                    Chapter 13

GABRIELLE SALMAN, aka ARCH MOD, aka                  Case No. 14-22017 (RDD)
GABRIELLE SALMAN MODULAR INC., aka
GABRIELLE SALMAN, ARCHITECT,

                                    Debtor.
-----------------------------------------------------------------x
GREG HAVENS,

                                    Plaintiff,
              vs.
                                                               Adv. No. 14-08219 (SHL)

GABRIELLE SALMAN, aka ARCH MOD, aka
GABRIELLE SALMAN MODULAR INC., aka
GABRIELLE SALMAN, ARCHITECT,

                                  Defendant.
-----------------------------------------------------------------x
EXCEL HOMES GROUP, LLC,

                                  Plaintiff,
              vs.
                                                               Adv. No. 14-08220 (SHL)

GABRIELLE SALMAN, aka ARCH MOD, aka
GABRIELLE SALMAN MODULAR INC., aka
GABRIELLE SALMAN, ARCHITECT,

                                  Defendant.
-----------------------------------------------------------------x
RBS CITIZENS, N.A.,

                                  Plaintiff,
            vs.
                                                                   Adv. No. 14-08221 (SHL)

GABRIELLE SALMAN, aka ARCH MOD, aka
GABRIELLE SALMAN MODULAR INC., aka
GABRIELLE SALMAN, ARCHITECT,

                                  Defendant.
-----------------------------------------------------------------x

## MEMORANDUM OF DECISION

A P P E A R A N C E S:

**GREG HAVENS**
*Pro Se*
301 West Post Road
White Plains, New York 10606

**JOHN A. POKA, ATTORNEY AT LAW**
*Counsel for Gabrielle Salman*
  By:   John A. Poka, Esq.
103 Steven Court
Monroe, New York 10950

**MARCO & SITARAS PLLC**
*Counsel for Excel Homes Group, LLC*
  By:   George Sitaras, Esq.
33 Whitehall Street, 16th Floor
New York, New York 10004

**ECKERT SEAMANS CHERIN & MELOTT, LLC**
*Counsel for RBS Citizens, N.A.*
  By:   Thomas M. Smith, Esq.
10 Bank Street, Suite 700
White Plains, New York 10606

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are three motions for summary judgment filed by Greg Havens ("Havens"), Excel Homes Group, LLC, ("Excel"), and RBS Citizens, N.A. ("RBS" and together with Havens and Excel, the "Plaintiffs") in the three above-captioned adversary proceedings.[1] The adversary proceedings were brought by each Plaintiff against Gabrielle Salman, the debtor in the above-captioned Chapter 13 case (the "Defendant"). The Plaintiffs all seek a determination that debts owed to them by the Defendant are nondischargeable under Section

---

[1] *See* Havens Motion for Summary Judgment, Adv. No. 14-08219 ("Havens ECF") [Havens ECF No. 21]; Excel Motion for Summary Judgment, Adv. No. 14-08220 ("Excel ECF") [Excel ECF No. 11]; RBS Motion for Summary Judgment Adv. No. 14-08221 ("RBS ECF") [RBS ECF No. 18].

2

523(a)(4) of the Bankruptcy Code based upon the Defendant's defalcation of trust funds while acting in a fiduciary capacity. The debts arose in connection with a project by the Defendant to construct a home for Plaintiff Havens (the "Havens Project"). Plaintiff Excel was a subcontractor that manufactured and delivered certain modular building units for the Havens Project and Plaintiff RBS was the lender that provided construction financing to Havens. Because the motions in the three cases concern the same set of facts and raise the same issues, the Court will address them together. For the reasons set forth below, Excel's and Havens' motions for summary judgment are granted and RBS's motion is denied.

## BACKGROUND

The Defendant is a licensed architect in the State of New York and has been since 1992. *See* Deposition of Gabrielle Salman, dated July 28, 2014 ("Salman Dep."), Exh. I attached to Havens Motion for Summary Judgment ("Havens Motion") at 5:17-21 [Havens ECF No. 21-12].[2] The Defendant is the sole shareholder, principal, and officer of Gabrielle Salman Modular, Inc. ("Modular"). *See* Salman Dep. at 8:8-13. The Defendant is also the president and a fifty percent shareholder of another company, Arch-Mod, Inc. ("Arch-Mod"), with Timothy Hourihan being the other fifty percent shareholder. *See* Salman Dep. at 6:5-19; Decl. of Gabrielle Salman ¶ 3 [Excel ECF No. 15]. As president of Arch-Mod, the Defendant was responsible for

---

[2]  The facts set forth are undisputed. In response to Havens' Statement of Undisputed Facts [Havens ECF No. 21-2], the Defendant submitted a Counterstatement of Undisputed Facts pursuant to Local Bankruptcy Rule 7056-1 [Havens ECF No. 24]. Local Rule 7056-1(d) provides that each numbered paragraph in a statement of material facts shall be deemed admitted for the purposes of the motion unless specifically controverted in the opposing party's responsive statement. For many of the numbered paragraphs, the Defendant responded that Havens had mischaracterized the facts or that the citations were erroneous, but failed to controvert or dispute the facts alleged. But the Defendant did not cite to any evidence in the record to support or controvert any statements, as is required under Local Rule 7056-1(e). *See In re Sulton Realty, LLC*, 2012 WL 6681845, at *4 (Bankr. S.D.N.Y. Dec. 21, 2012). Thus, for the purposes of summary judgment, the Court has treated as undisputed facts those instances where the Defendant did not specifically controvert or dispute the fact. Additionally, as it pertains to Excel's and RBS's motions, the Defendant failed to submit any Counterstatement of Undisputed Facts for either motion and as such, the Court deems admitted all facts alleged by Excel and RBS. But even if the Court were to consider the Defendant's pleading in the Havens case as if it were filed in the other two adversary proceedings, the Defendant still does not dispute the relevant material facts that provide a basis to grant summary judgment to Excel.

3

overseeing the accounts and "partially" represented the company with respect to day-to-day operations. *See* Salman Dep. at 65:12-66:7. Arch-Mod was incorporated in North Dakota because the Defendant and Hourihan were involved in a real estate project there ("North Dakota Project"). *See* Salman Dep. at 28:24-30:22.

In October 2012, Havens entered into an agreement with Modular—not Arch-Mod—for Modular to supply for $207,000.00 a "Single Family Modular Component" for the construction of Havens' new residence, as well as provide construction management services for the Havens Project. *See* Havens-Modular Agreement, Exh. B attached to Havens Motion [Havens ECF No. 21-5]. Prior to that agreement, Modular had already agreed with Excel to manufacture and deliver certain modular building units for the Havens Project for $153,904.39. *See* Excel-Modular Agreement, Exh. A attached to Excel Motion for Summary Judgment ("Excel Motion") [Excel ECF No. 11-2]; Decl. of Jolene Myers ("Myers Decl.") ¶ 6 [Excel ECF No. 11-1]. In November 2012, Havens entered into a "Residential Construction Loan Agreement" with RBS, whereby Havens borrowed $680,000 to be used for the construction of his new home. *See* RBS-Havens Agreement, Exh. C attached to Havens Motion [Havens ECF No. 21-6]. On that same day, Havens' spouse, Donnis Glover, asked the Defendant to provide bank account information for the transfer of funds from RBS to the Defendant. *See* Decl. of Greg Havens ("Havens Decl.") ¶ 8 [Havens ECF No. 21-3]. Using Modular's business e-mail address, the Defendant provided Havens with Arch-Mod's account number, routing number, and bank address. *See* Havens Decl. ¶ 9; *see also* E-Mail, Exh. J attached to Havens Motion [Havens ECF No. 21-13]. On November 27, 2012, Havens' attorney issued a check to Arch-Mod in the amount of $197,454.00 from the RBS loan proceeds. *See* Arch-Mod Check, Exh. E attached to Havens Motion [Havens ECF No. 21-8]. As to these funds, the Defendant understood that she was

4

obligated "to pay Excel and pay the other people that are to do with [the Havens Project]" and it was her responsibility "to utilize [the funds] for the project." Salman Dep. at 75:23-76:3, 89:22-90:3. But at the Defendant's direction, these funds were not deposited into Modular's bank account and instead went into the Arch-Mod account. *See* Salman Dep. at 86:19-87:9. Arch-Mod apparently accepted the funds on behalf of Modular because Modular's bank account was closed at that time. *See* Salman Dep. at 19:3-18. The Arch-Mod account was shared by the Defendant and her business partner Hourihan; and both were signatories on the account, although Hourihan had possession of the company's check book. *See* Salman Dep. at 18:21-19:10; 27:16-28:5. Arch-Mod and Hourihan, however, had no involvement with the Havens Project. *See* Salman Dep. at 14:12-14; 77:5-8.

One day after the funds from Havens' attorney were deposited into the Arch-Mod account, Hourihan used the funds deposited for the Havens Project by writing a check for $100,000 from the Arch-Mod account to a company called "The King of Rock and Roll" for an unrelated project. *See* Salman Dep. at 30:25-31:12, 32:6-11, 78:4-79:3; *see also* Hourihan Check, Exh. N attached to Havens Motion [Havens ECF No. 21-17]. The Defendant became aware of Hourihan's diversion of funds about a week or two after the Defendant received the initial deposit from Havens. *See* Salman Dep. at 78:4-79:3. The Defendant contacted Hourihan to inform him that the funds had "to come back to the account ASAP because these were not the funds to go to anybody else." Salman Dep. at 77:14-22. Hourihan responded that the funds would be returned by the time payment was due to Excel, upon delivery of the modular component. *See* Salman Dep. at 77:24-78:3. Sometime thereafter, Hourihan withdrew an additional $20,000 in cash from the Arch-Mod account. *See* Salman Dep. at 79:15-21.

5

On March 6, 2013, Havens sent an e-mail to the Defendant requesting a "payment breakout for the $197K for the initial payment." E-mail, Exh. K attached to Havens Motion [Havens ECF No. 21-14]; *see* Havens Decl. ¶ 11. The Defendant responded by claiming that $89,445 remained from the first payment, even though she had been aware since December 2012 that $120,000 of the $197,454 had been diverted and had not been returned. *See* Havens Decl. ¶ 11; *see also* E-mail, Exh. K attached to Havens Motion. The Defendant also represented that she had paid Excel $54,450, despite having not submitted any payment to Excel at that time. *See* Havens Decl. ¶ 11. The Defendant never informed Havens that most of the first payment had been used for things unrelated to the Havens Project and that she would be unable to complete payment to Excel upon delivery of the modular units. *See id.* at ¶ 16. The Defendant admits that it was her usual practice to pay the manufacturer when the house was delivered. *See* Salman Dep. at 87:10-14.

The Defendant subsequently requested additional funds from Havens to complete payment to Excel. *See* Havens Decl. ¶ 11. On March 25, 2013, the Defendant received a check drawn from the RBS loan proceeds in the amount of $34,505, bringing the total sum received by the Defendant for the Havens Project to $231,505. *See* Havens Decl. ¶¶ 12, 13; Salman Dep. at 74:9-23; 12:23-14:7; *see also* RBS Check, Exh. F attached to Havens Motion [Havens ECF No. 21-9]. The Defendant endorsed this check to Excel, leaving the unpaid balance due to Excel at $119,399.39. *See* Myers Decl. ¶¶ 9, 10; *see also* RBS Check, Exh. F attached to Havens Motion. The modular units were delivered to the Havens Project site by Excel on March 27, 2013. *See* Havens Decl. ¶ 17. The only payment from the Defendant to Excel was the endorsed check in the amount of $34,505 and no portion of the initial payment of $197,454 received by the Defendant was ever paid to Excel. Salman Decl. ¶ 7; Myers Decl. ¶ 8. Because of the

6

Defendant's failure to pay Excel for the full cost of the modular units, Excel filed a mechanic's lien against the Havens Project in the amount of the unpaid balance of $119,399.39. *See* Havens Decl. ¶ 19; *see also* Lien, Exh. G attached to Havens Motion [Havens ECF No. 21-10].

The Defendant eventually received $35,000 of the $100,000.00 that Arch-Mod paid out to the unrelated project. *See* Salman Dep. at 38:12-23. But these reclaimed funds—money originally paid by Havens—went to pay the Defendant's other outstanding obligations, including the electrical and telephone bills for her own home, as well as transportation and food expenses. *See* Salman Dep. at 36:19-37:25. None of these returned funds were ever used to pay the outstanding balance owed to Excel. *Cf.* Myers Decl. ¶ 8.[3]

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a) (made applicable to the adversary proceeding by Fed. R. Bankr. P. 7056). A material fact is one that "might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (citations and internal quotation marks omitted). A dispute about a material fact is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted).

---

[3] There is no evidence in the record pertaining to checks written by the Defendant to any subcontractors or other trust beneficiaries related to the Havens Project during the period of September 2013 to December 2013.

7

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Ames Dep't Stores, Inc. v. Wertheim Schroder & Co. (In re Ames Dep't Stores, Inc.)*, 161 B.R. 87, 89 (Bankr. S.D.N.Y. 1993). Once the moving party meets this initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, demonstrate that there is a genuine issue of material fact for trial. *See Celotex*, 477 U.S. at 323; *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (after the moving party has met its burden under Rule 56(c), opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The non-movant must put forth "significant probative evidence" showing a genuine dispute as to a material fact exists. *Anderson*, 477 U.S. at 249. If the non-moving party fails to make such a showing, then the moving party is "entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322-23; Fed. R. Civ. P. 56(e). Moreover, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsuhita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Az. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)); *see also Weg v. Macchiarola*, 654 F. Supp. 1189, 1191-92 (S.D.N.Y. 1987).[4]

---

[4]  After the filing of the Plaintiffs' motions, an order was entered dismissing the underlying bankruptcy case of the Defendant. *See* Order Dismissing Chapter 13 Case, Case No. 14-22017 [ECF No. 111]. The Second Circuit has held that "the dismissal of an underlying bankruptcy case does not automatically strip a federal court of jurisdiction over an adversary proceeding . . . [and] [t]he decision whether to retain jurisdiction should be left to the sound discretion of the bankruptcy court . . . ." *Porges v. Gruntal & Co. (In re Porges)*, 44 F.3d 159, 162 (2d Cir. 1995). In determining whether to retain jurisdiction, the court must consider four factors: "judicial economy, convenience to the parties, fairness and comity." *Id.* at 162-63. (citations omitted); *see also Jam. Shipping Co. v. Orient Shipping Rotterdam, B.V. (In re Millennium Seacarriers, Inc.)*, 458 F.3d 92, 96 (2d Cir. 2006) (citing *In re Porges*, 44 F.3d at 163); *Labgold v. Healey (In re Healey)*, 2006 WL 1234964, at *1 (Bankr. D.D.C. Mar. 5, 2006); *In re Davidson*, 186 B.R. 741, 742 (Bankr. N.D. Fla. 1995) (citing *U.S. v. Mosley (In re Mosely)*, 161 B.R. 382, 384 (Bankr. E.D. Tex. 1993)). In this case, the Defendant advocates for dismissal of this adversary proceeding based on mootness while the Plaintiffs request that the Court resolve the pending motions. The Court concludes that the relevant factors weigh in favor of the Court retaining jurisdiction to rule on these motions. Mr. Havens has been unable to finish the construction of his home because of the mechanic's lien that was filed more than three years

### B. Nondischargeability under Section 523(a)(4)

"The basic policy animating the Bankruptcy Code is to afford the 'honest but unfortunate' debtor a fresh start." *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 66 (2d Cir. 2007). For the protection of creditors, however, Bankruptcy Code Section 523(a)(4) provides an exception to discharge for any debts that arise out of the debtor's "fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4). Courts have cautioned that "[t]he consequences to a debtor whose obligations are not discharged are considerable; in many instances, failure to achieve discharge can amount to a financial death sentence." *In re Hyman*, 502 F.3d at 66. Thus, in order "[t]o give effect to the 'fresh start' policy of the Code, exceptions to discharge under [Section] 523 are to be strictly and literally construed against a creditor and liberally construed in favor of the debtor." *Curtis Lumber Co. v. Waldron (In re Waldron)*, 2015 WL 6734481, at *4 (Bankr. N.D.N.Y. Nov. 3, 2015) (citing *Andy Warhol Found. for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d 162, 170 (2d Cir. 1999)); *Chao v. Duncan (In re Duncan)*, 331 B.R. 70, 87 (Bankr. E.D.N.Y. 2005) ("This penalty is not lightly to be invoked, as it is widely recognized that exceptions to discharge are narrowly construed."). Further, the Supreme Court has held that the party claiming nondischargeability bears the burden of establishing each element under the "the ordinary preponderance standard." *Grogan v. Garner*, 498 U.S. 279, 288 (1991).

To prevail under a Section 523(a)(4) discharge exception, a creditor must establish three elements: "first, that the debt was incurred in connection with an express or technical trust,

---

ago. The subcontractor Excel has similarly been left in limbo and indeed has had to file its own bankruptcy case. *See* Notice of Suggestion of Bankruptcy, dated June 22, 2016 [Excel ECF No 18]. A resolution of these adversary proceedings will go a long way towards helping the parties resolve these issues. While Ms. Salman's current bankruptcy has been dismissed, there is nothing to prevent her from filing another case, which would once again leave these parties unclear as to their rights. Given these factors and that these motions were all briefed and argued before the Defendant's bankruptcy was dismissed, the Court believes it is more fitting to resolve this dispute on the merits rather than to dismiss the action as moot.

9

second, that the debtor acted in a fiduciary capacity with respect to that trust, and third, that the debtor engaged in fraud or defalcation within the meaning of bankruptcy law." *VW Credit, Inc. v. Salim (In re Salim)*, 2015 WL 1240000, at *14 (Bankr. E.D.N.Y. Mar. 16, 2015); *In re Duncan*, 331 B.R. at 77. The Court will separately address each of these elements.

**1. Existence of Express or Technical Trust**

As to whether the debt was incurred in connection with an express or technical trust, courts look to whether an express trust was created by statute. *Shearson Lehman Hutton, Inc. v. Schulman (In re Schulman)*, 196 B.R. 688, 697 (Bankr. S.D.N.Y. 1996). Thus, while Section 523 is governed by federal law, bankruptcy courts may look to state statutes to determine whether a trust exists. *Zohlman v. Zoldan*, 226 B.R. 767, 773 (S.D.N.Y. 1998). Here, the Court looks to Article 3-A of the New York Lien Law, which provides that "funds . . . received by a contractor under or in connection with a contract for an improvement of real property . . . shall constitute assets of a trust . . . ." N.Y. Lien Law § 70(1).[5] The assets are to be held in trust by the contractor to pay the "claims of subcontractors, . . . laborers[,] and materialmen[,]" N.Y. Lien Law § 71(2)(a), and the trust "continues until all trust claims have been paid or discharged, or all assets have been applied for the trust purposes." *RLI Ins. Co. v. New York State Dep't of Labor*, 97 N.Y.2d 256, 262 (2002) (citing N.Y. Lien Law § 70(3)) (additional citations omitted). "Hence, Article 3-A clearly creates an express trust within the meaning of Section 523(a)(4)." *Sandak v. Dobrayel (In re Dobrayel)*, 287 B.R. 3, 15-16 (Bankr. S.D.N.Y. 2002) (citations omitted).

The Defendant has not disputed the existence of a trust here in her opposition to the motions. Indeed, it is undisputed that the Defendant's business Modular is a contractor, as

---

[5]    The New York Lien Law defines contractor as "a person who enters into a contract with the owner of real property for the improvement thereof." N.Y. Lien Law § 2(9).

defined by Section 2(9) of the Lien Law and that the Defendant, as the sole owner and principal of Modular, entered into an agreement with Havens for the improvement of Havens' real property. *See* Havens-Modular Agreement, Exh. B attached to Havens Motion. It is also undisputed that the Defendant received payments from Havens through her Arch-Mod bank account, which were accepted on behalf of Modular for the Havens Project. *See* Arch-Mod Check, Exh. E attached to Havens Motion; RBS Check, Exh. F attached to Havens Motion; Salman Dep. at 87:6-9. Pursuant to Section 70(3) of Article 3-A, the receipt of these funds by the Defendant, as the sole officer of Modular and president of Arch-Mod, triggered the creation of an express trust. *See* N.Y. Lien Law § 70(3). (providing that the trust commences as soon as the contractor receives payment from the owner). Thus, the Court finds the existence of an express trust in connection with the debt.

To rely on Article 3-A for purposes Section 523(a)(4), however, a party must also show that it qualifies as a beneficiary of the trust under Article 3-A of the Lien Law and thus would be "entitled to invoke the benefits of Section 523(a)(4)." *In re Dobrayel*, 287 B.R. at 16; *see also Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 623 (Bankr. N.D.N.Y. 2010) (as beneficiaries of the trust fund, the plaintiffs "can therefore rely on Article 3-A to show fraud or defalcation while acting in a fiduciary capacity").

Excel clearly qualifies as a beneficiary of the Article 3-A trust here. The Lien Law establishes that assets received by a contractor for an improvement of real property are to be held in trust "for the benefit of subcontractors, architects, engineers, surveyors, laborers and materialmen who perform labor or furnish supplies for that improvement . . . ." *In re Waldron*, 2015 WL 6734481, at *4 (citing N.Y. Lien Law §§ 70, 71). Further, "[t]he primary purpose of Article 3-A of the Lien Law is to ensure that those who directly expend labor and materials to

11

improve real property at the direction of a contractor or property owner receive payment for the work performed or materials supplied." *Id.* (citing *ECD NY, Inc. v. Britt Realty, LLC*, 7 N.Y.S.3d 861, 863 (Sup. Ct. Kings Cty. 2015) (citations omitted)). Excel qualifies as both a subcontractor under Section 2(10)[6] or a materialman under Section 2(12)[7] for the project to build a house for Mr. Havens. N.Y. Lien Law § 71(2) (identifying subcontractor and materialman as beneficiaries of Article 3-A trust).

Mr. Havens also qualifies as a beneficiary as he is the owner of the property where the house was to be constructed. Section 71(2)(f) of the Lien Law provides that trust assets are to be held for "payment to which the owner is entitled pursuant to the provisions of section seventy-one-a of this chapter." N.Y. Lien Law § 71(2)(f). Under Section 71-a(4)(a), "[i]f an owner makes an advance deposit under a home improvement contract, the owner retains the property interest in such monies until the trust terminates . . . ." *In re Henderson*, 423 B.R. at 623 (citing N.Y. Lien Law § 71-a(4)(a)). As courts have recognized, therefore, "owners are beneficiaries under the trusts created by . . . Article 3-A of the New York Lien Law." *In re Dobrayel*, 287 B.R. at 18. Here, the trust was never terminated because the Defendant failed to pay Excel, a trust beneficiary, in full. *See* Havens Decl. at ¶ 19; *see also Dobrayel*, 287 B.R. at 18-19 (noting that "[i]f the contractor does not pay his subcontractors, workers and materialmen, ultimately it is the owner who must pay to avoid the subcontractors' liens on his property and who must, thereby, be the ultimate beneficiary of the statute.").

---

[6]    Section 2(10) defines subcontractor as "a person who enters into a contract with a contractor . . . for the improvement of such real property . . . ." N.Y. Lien Law § 2(10).

[7]    Section 2(12) defines materialman as "any person who furnishes material . . . either to an owner, contractor or subcontractor, for, or in the prosecution of such improvement." N.Y. Lien Law §2(12).

12

The Court reaches the opposite conclusion as to plaintiff RBS. It has failed to put forth any authority why a bank loaning money to the home owner would qualify as a trust beneficiary under the Lien Law. The Lien Law does not list such lenders as a beneficiary of the trust, and such lenders do not fall into any of the categories laid out by Section 71(2). Based on the present record, therefore, the Court cannot grant relief to RBS on the basis of Article 3-A.

**2. Fiduciary Capacity**

As to the second element under Section 523(a)(4), "[c]ourts have consistently found that 'fiduciary capacity' refers to 'fiduciary relationships that arise from express or technical trusts.'" *In re Salim*, 2015 WL 1240000, at *16 (citing *T & D Moravits & Co. v. Munton (In re Munton)*, 352 B.R. 707, 712-13 (B.A.P. 9th Cir. 2006)). Thus, while fiduciary capacity is defined as a matter of federal law, "state law tells us when an express or technical trust exists in the individual case." *Zohlman*, 226 B.R. at 773; *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986) ("Although the concept of fiduciary is to be narrowly defined as a matter of federal law, state law is to be construed to determine when a trust in this strict sense exists."). "If state law creates an express or technical trust relationship between the debtor and another party and imposes trustee status upon the debtor, the debtor will be a fiduciary under [S]ection 523(a)(4)." *Woodworking Enters., Inc. v. Baird (In re Baird)*, 114 B.R. 198, 202 (B.A.P. 9th Cir. 1990) (citing *Ragsdale*, 780 F.2d at 796-97). Thus, in order to establish the existence of a fiduciary obligation, "[t]he statute must define the trust res, spell out the trustee's fiduciary duties and impose a trust prior to and without reference to the wrong which created the debt." *In re Baird*, 114 B.R. at 202.

Article 3-A satisfies these requirements. It "clearly identifies the trust res as the funds received by the contractor for the improvement of real property." *In re Dobrayel*, 287 B.R. at

13

15; N.Y. Lien Law § 70(1). Further, "the trustee is charged with extensive, affirmative duties in managing the trust, including the duties of keeping detailed records and segregating the trust funds." *In re Kawczynski*, 442 F. Supp. 413, 417 (W.D.N.Y. 1977); *see* N.Y. Lien Law §§ 74, 75. Additionally, the trust under Article 3-A is created upon the contractor's receipt of payment from the owner, "whether or not there shall be at that time any beneficiary of the trust." N.Y. Lien Law § 70(3). Thus, the "fiduciary relationship under Article 3-A exists prior to and independently of the wrongful conduct because the trustee's duties begin as soon as he receives the funds for the improvement of real property." *In re Dobrayel*, 287 B.R. at 15; *see* N.Y. Lien Law § 70(3). In sum, "the provisions of Article 3-A of the New York Lien Law create an express statutory trust, and thus give rise to the fiduciary relationship essential for application of Code [Section] 523(a)(4)." *Dawley v. Gould (In re Gould)*, 65 B.R. 87, 89 (Bankr. N.D.N.Y. 1986) (citing *Truax & Hovey, Ltd. v. Grosso (In re Grosso)*, 9 B.R. 815, 820-21 (Bankr. N.D.N.Y. 1981)) (additional citations omitted).

Applying these principles to the facts of this case, the Defendant had direct control over the application of trust funds as the sole officer of Modular. She directed Havens in an e-mail to deposit the funds in the Arch-Mod account, which were accepted on behalf of Modular. *See* E-Mail, Exh. J attached to Havens Motion; Salman Dep. at 87:6-9.[8] Upon the Defendant's receipt of the payment from Havens, Modular became a statutory trustee pursuant to Section 70(3) of the Lien Law, and the Defendant as the sole officer of Modular was acting in a fiduciary capacity with respect to the trust beneficiaries. Indeed, the Defendant does not dispute that she personally was acting in a fiduciary capacity as she admits that "[she] was a trustee, administrator, and fiduciary of the trust fund . . . ." *See* Defendant's Opposition to Plaintiff's Motion for Summary

---

[8]    The Defendant testified in her deposition that as president of Arch-Mod she was responsible for overseeing the Arch-Mod account. *See* Salman Dep. at 65:21-23.

14

Judgment ("Def's. Opp.") at 16 [Havens ECF No. 24]. Accordingly, the Court concludes that the second element of Section 523(a)(4) has been met. *See Bruce Supply Corp. v. Kofsky (In re Kofsky)*, 351 B.R. 123, 129 (Bankr. S.D.N.Y. 2006) ("An officer with direct control over the application of trust funds acts 'in a fiduciary capacity' prior to the wrongful act, and . . . the resulting debt may be non-dischargeable in the officer's subsequent bankruptcy."); *cf. In re Lehr Constr. Corp.*, 2015 WL 5174467, at *8 (Bankr. S.D.N.Y. Sept 2, 2015) ("A trust beneficiary has a cause of action personally against principals of an Article 3-A trustee company for the improper diversion of Article 3-A trust funds.") (citing *Ippolito v. TJD Dev., LLC*, 920 N.Y.S.2d 108, 118 (App. Div. 2d Dep't 2011)); *Jasel Bldg. Prods. Corp. v. Polidoro (In re Polidoro)*, 12 B.R. 867, 871 (Bankr. E.D.N.Y. 1981) ("New York courts have made the liability of managing officers coextensive with that of the corporate contractor, provided they have participated in or have knowledge of the misapplication of trust funds . . . .").

### 3. Defalcation

As to the third element—whether the debtor breached her fiduciary duty by defalcation—the Supreme Court has held that defalcation requires "a culpable state of mind . . . involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1757 (2013). Under this standard,

> [w]here actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty. That risk 'must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a *gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation.'"

*Bullock*, 133 S. Ct. at 1759-60 (emphasis in original) (quoting ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985)).

15

Thus, "[t]he court must consider the debtor's actual knowledge and circumstances (i.e., the subjective) and then decide whether the related conduct constituted a gross deviation from legal standards of conduct (i.e., the objective)." *Fogg v. Pearl (In re Pearl)*, 502 B.R. 429, 441 (Bankr. E.D. Pa. 2013). It must be shown that the debtor was subjectively aware of the risk that her conduct might violate her fiduciary duty; a showing that the debtor objectively should have been aware, by itself, is not sufficient. *MacArthur Co. v. Cupit (In re Cupit)*, 514 B.R. 42, 50 (Bankr. D. Colo. 2014) (citing *People v. Hall*, 999 P.2d 207, 219-20 (Colo. 2000)); *see also E. Armata, Inc. v. Parra (In re Parra)*, 412 B.R. 99, 106 (Bankr. E.D.N.Y. 2009). Hence, it must also be shown that the debtor was subjectively aware of her fiduciary duty because "[a] debtor cannot *consciously* disregard a risk of violating a fiduciary duty if he or she is wholly unaware of that duty." *In re Cupit*, 514 B.R. at 51 (emphasis in original). However, the court in *In re Cupit* noted, "[t]his is not to say a debtor must admit to being aware of a fiduciary duty. Conscious disregard, like other intent elements, may be inferred from the particular facts of the case." *Id.* (citing *Hall*, 999 P.2d at 220) ("A court or trier of fact may infer a person's subjective awareness of a risk from the particular facts of a case, including the person's particular knowledge or expertise.").

In determining whether a risk is substantial, courts examine "the likelihood that harm will occur and the magnitude of the harm." *Id.* at 52 (quoting *Hall*, 999 P.2d at 218). In determining whether a risk is unjustifiable, courts look to "the nature and purpose of the actor's conduct relative to how substantial the risk is." *Id.* Further, in guiding courts' determination of whether the debtor's conduct was grossly reckless, the Seventh Circuit recently held that subjective recklessness is evident where the breach of fiduciary duty is "so basic and the risk of harm . . . so

16

obvious that [the debtor] must have recognized them and proceeded despite the risk." *Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921, 926 (7th Cir. 2016).

The Court concludes that the undisputed facts establish that the Defendant breached her duty by defalcation in recklessly depositing the trust funds from the Havens Project into the Arch-Mod account. The Defendant admits to being a fiduciary of the trust funds. *See* Def's Opp. at 16. Arch-Mod had no involvement in the Havens Project as the Defendant had created Arch-Mod for a different project in North Dakota. By placing the trust funds in the Arch-Mod account, the Defendant made the trust funds from the Havens Project available to the Defendant's partner in Arch-Mod, who used them for an unrelated purpose. Under these circumstances, there was a substantial risk of the trust funds being used for non-trust purposes and the magnitude of the harm was significant. *See In re Cupit*, 514 B.R. at 52. The risk was also unjustifiable, as the Defendant's only reasoning for depositing the funds in the Arch-Mod account was because she failed to maintain a bank account for Modular. *See id.*

The Defendant contends that Hourihan had a "position of ascendancy" over her and as such, she was "incapable of monitoring [his] performance." Def's Opp. at 17 (quoting *Marchiando v. Illinois (In re Marchiando)*, 13 F.3d 1111, 1116 (7th Cir. 1994)). But this argument only supports the conclusion that the Defendant acted recklessly. If the Defendant believed that she was incapable of monitoring Hourihan's performance, she knew the peril of putting the trust funds into an account to which Hourihan had access. Thus, she consciously disregarded a substantial and unjustifiable risk that her conduct would allow the Havens' funds to be used for non-trust purposes. *See Bullock*, 133 S. Ct. at 1759-60. Further, the risk that the trust funds would be used by Hourihan for non-trust purposes was "of such a nature and degree that . . . its disregard involve[d] a gross deviation from the standard of conduct that a law-abiding

17

person would observe in the actor's situation." *Id.* at 1760. Indeed, this breach of fiduciary duty is "so basic and the risk of harm . . . so obvious that [the defendant] must have recognized them and proceeded despite the risk." *In re Jahrling*, 816 F.3d at 926.

This conclusion is further supported by the Defendant's use of $35,000 worth of trust funds on her personal expenses, including electrical and telephone bills for her home. The Defendant admits that she was able to reclaim $35,000 worth of the initial $100,000 diversion of trust funds but then spent these funds for non-trust purposes. *See* Salman Dep. at 36:14-37:24. The Defendant did so despite being aware that she was still obligated to pay all trust beneficiaries before using those funds for non-trust purposes. This constitutes an intentional diversion of trust funds by the Defendant and evinces "a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." *Bullock*, 133 S. Ct. at 1760.

## **CONCLUSION**

For the reasons stated above, the Court grants Havens' and Excel's Motions for Summary Judgment and concludes that the Defendant's debts to them are non-dischargeable under Section 523(a)(4). RBS's Motion for Summary Judgment is denied. The Plaintiffs are to settle an order on five days' notice. The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon counsel for the Defendant.

Dated: New York, New York
      November 7, 2016

                                      */s/ Sean H. Lane*
                                      UNITED STATES BANKRUPTCY JUDGE